UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TROY M. LINDELL, ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY SITUATED, | Case No.: No. 11-cv-02053-LJO-BAM |
| | **FINDINGS AND RECOMMENDATIONS GRANTING PLAINTIFF'S MOTION FOR CLASS CERTIFICATION;** |
| Plaintiff, | |
| vs. | **ORDER DENYING PLAINTIFF'S MOTION TO STRIKE** |
| SYNTHES USA, SYNTHES USA SALES LLC, SYNTHES SPINE COMPANY, LP, | |
| Defendants. | |

## I.      INTRODUCTION

In this action for violations of the California Labor Code, Plaintiff Troy Lindell moves for class certification pursuant to Fed. R. Civ. Pro. 23(a) and 23(b)(3).  (Doc. 87, 88.)  Defendant Synthes[1] filed its opposition on November 5, 2013. (Doc. 115.)  Plaintiff filed his reply brief on November 25, 2013. (Doc. 121.)  The Court held oral arguments on February 24, 2014.  (Doc. 138.)  Counsel Angelica Jongco, Charles Taylor and Catha Worthman appeared in person for Plaintiff.  Counsel Anthony Haller, Oliver Wanger and Micaela Neal appeared in person for Defendant.

---

[1] Defendants are comprised of three related entities: Synthes USA, Synthes USA Sales LLC, and Synthes Spine Company, LP.  The Court refers to the Defendants collectively as "Synthes."

Having carefully considered the parties' submissions, oral arguments, and the entire record in this case, the Court recommends Plaintiff's Motion for Class Certification be GRANTED.[2]

## II.     BACKGROUND

### A.     Factual Background

Synthes is a leading medical device company that designs, manufactures, markets, and distributes implants and instruments for surgery. Synthes employs specially trained sales consultants to market and sell its products to customer hospitals, surgery centers, and physicians. In California, Synthes has employed approximately 180 sales consultants across three sales divisions: (1) Trauma, (2) Spine, and (3) Craniomaxillofacial ("CMF") during the proposed class period, from December 13, 2007, through the present.

Sales consultants' duties are performed primarily in the field, away from Synthes' offices or facilities. Sales consultants make sales calls through in-person meetings with physicians and travel to diverse hospitals, doctors' offices, and other medical facilities.  In addition to sales responsibilities, sales consultants attend surgeries, prepare operating rooms to implant Synthes' devices, and explain the manner in which a device should be implanted.

Synthes compensates its sales consultants, in whole or in part, on a commission basis. Some sales consultants are paid on a salary plus commission basis (at a commission rate between 2% and 8% of monthly sales), while others are eligible for straight commission, with no salary (at a regular commission rate of 12.5% of monthly sales).

---

[2] Plaintiff moves to strike the declaration of Raymond F. Dovell, offered by Synthes in opposition to Plaintiff's motion for class certification.  (Doc. 120.) Synthes filed its opposition on January 31, 2014.  (Doc. 129.)  Plaintiff argues the Dovell declaration constitutes undisclosed expert testimony. (Doc. 120, 2: 4-7.)  Synthes responds the Dovell declaration is not expert testimony, but rather, summary evidence pursuant to Federal Rule of Evidence 1006.  (Doc. 129, 1: 2-13.)  Having reviewed the Dovell declaration, the Court does not find the declaration probative in deciding Plaintiff's Motion for Class Certification.  In ruling on Plaintiff's Motion for Class Certification, the Court has not relied upon the Dovell declaration.  Accordingly, Plaintiff's Motion to Strike the Dovell declaration (Doc. 120) is DENIED as moot.

**B.      Plaintiff's Legal Claims**

Plaintiff Troy Lindell, a former sales consultant for Synthes, challenges the legality of two employment policies. First, Plaintiff challenges Synthes' policy that similarly situated sales consultants are ineligible for business expense reimbursement.   Second, Plaintiff challenges Synthes' policy of taking deductions from sales consultants' commissions.

Plaintiff alleges that both of these policies violate the California Labor Code. Specifically, Plaintiff alleges Synthes' expense reimbursement policies violate California Labor Code § 2802, which provides "[a]n employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties . . . ." Cal. Lab. Code § 2802(a).  Plaintiff alleges Synthes' deduction policies violate three provisions of the California Labor Code.  Specifically, Labor Code § 221 makes it "unlawful for any employer to collect or receive from an employee any part of wages theretofore paid by said employer to said employee." Lab. Code § 221.  Section 223 provides that "where any statute or contract requires an employer to maintain the designated wage scale, it shall be unlawful to secretly pay a lower wage while purporting to pay the wage designated by statute or by contract." Lab. Code § 223.  Finally, Labor Code § 300 prohibits the assignment of wages except under very limited circumstances. Lab. Code § 300.[3]

**C.      Challenged Policies**

**1.      Synthes' Expense Reimbursement Policy**

California sales consultants perform the same core job duties and have uniform job descriptions.  (Doc. 88, Attach. 10) (Synthes' Sales Policy Manuals for the years 2009-2012

---

[3] In addition to the expense and deductions claims, Plaintiff has pled claims for waiting time penalties pursuant to Labor Code §§201-203. These claims, however, are entirely dependent on Plaintiff's ability to establish an expense or deduction violation. Similarly, Plaintiff's claims for unlawful business practices under California Business and Professions Code § 17200 (the "Unfair Competition Law" or "UCL"), and penalties under the California Private Attorney General Act, Labor Code § 2698 et seq. are predicated on Plaintiff's ability to establish liability for his expense or deduction claims.  Neither party discussed these dependent claims or argued they implicated unique Rule 23 concerns. Accordingly, the Court limits its Rule 23 analysis to the expense and deduction claims, and does not separately discuss these dependent claims. However, the Rule 23 analysis of Plaintiff's expense and deduction claims applies with equal force to the waiting time, UCL and private attorney general claims.

articulate uniform job descriptions); *see also,* Declaration of Jaqueline Meister[4], Doc. 88, Attach. 5; 49:2-6; 57:9-14; 53: 18- 54: 8; 60: 10-21) (testifying that the job descriptions and requirements are the same for all sales divisions).[5]  In performing these duties, sales consultants have certain common expenses.  For example, sales consultants are required by policy to maintain a separate business phone line with the phone number listed as "Synthes" with the phone company.  (Doc. 89, Attach. 2) (Synthes' 2007 Sales Policy Manual states that "[a]ll Synthes Consultants are to maintain a separate and dedicated business phone line for Synthes business.  This phone number will be listed as 'Synthes' with the phone company . . . The expenses for the Synthes phone line, phone equipment and cell phones are the responsibility of the Consultant.") Other potentially common business expenses may include home office, internet, freight, automobile and other travel related expenses.

Plaintiff cites documentary evidence that Synthes' policy did not reimburse straight commission sales consultants ("SC Sales Consultants") for ordinary business expenses.  For Trauma and Spine SC Sales Consultants, Synthes' 2007 and 2010 policy manuals provide the following guidance for expense reimbursement:

> The current commission rate for a Sales Consultant receiving straight commission is 12.5%. Sales Consultants who convert to straight commission are not eligible for an automobile allowance or in-territory business expense reimbursements.

Doc 89, Attach. 2 at 427, 436; Attach. 3 at 536, 540.  For CMF SC Sales Consultants, the 2007 and 2010 policy manuals state:

> When a Sales Consultant's territory reaches an annualized volume sales of $600,000 or more, the Regional Manager may recommend that the Sales Consultant converts his/her compensation package from salary, commission plus expenses, to a predetermined base salary of $30,000, plus a higher level of commissions with no expenses.

---

[4] Jaqueline Meister was Synthes' designated witness pursuant to Fed. R. Civ. P. 30(b)(6).

[5] Indeed, at oral argument, Counsel for Synthes acknowledged that the job requirements are the same across all three sales divisions.

4

Doc. 89, Attach. 2, at 432; Attach. 3 at 532. With respect to open sales territories[6], as applied to all sales divisions, the 2007 and 2010 manuals provides that sales consultants will receive expense reimbursement when covering open sales territory if "their normal compensation package includes business expense reimbursement." Doc. 89, Attach. 2, at 431; Attach. 3 at 534-35. Plaintiff also refers to Synthes' travel and expense policy, providing that "field employees who are on straight commission will <u>not</u> be reimbursed for their expenses while they are in-territory."  Doc. 88, Attach. 4 at 585 (Emphasis in original).

Synthes disputes Plaintiff's expense reimbursement claims and argues that SC Sales Consultants are indemnified for expenses through an enhanced commission.  Synthes argues that managers orally communicate to SC Sales Consultants that the 12.5% enhanced commission covers necessary business expenses.   Synthes cites the declarations of regional managers and current SC Sales Consultants, who state that sales consultants knew, based on oral communications with managers and Synthes' written policy, that they would generate more income as a SC Sales Consultant, inclusive of necessary business expenses, rather than a partially salaried sales consultant who receives direct expense reimbursement. (Synthes Opp., Doc. 115, 7: 27 – 13: 4.) Synthes also points to its recent 2013 policy manuals as evidence that necessary business expenses are built into SC Sales Consultants enhanced commissions:

> A straight commission Sales Consultant is not eligible for a separate auto allowance or direct reimbursement of in-territory business expenses. Based on an allocation of $1,400 per period for expenses ($500 for auto allowance and $900 for variable expenses), payment for expenses is built into the total full commission compensation program. . .
>
> Upon conversion [to straight commission], the $500 per period auto allowance and up to $900 per period of reimbursable in-territory business expenses are built into the full commission base compensation plan.

---

[6] "In-territory," and "open territory" are terms of sales parlance. "In-territory" describes a customer group or geographic district for which an individual sales consultant holds responsibility.  "Open territory" describes a customer group or geographic district for which there is no responsible individual sales consultant.

Doc. 89, Attach 6 at 003543, 003545. Synthes claims this latest policy statement does not reflect a policy change, but rather, is a memorialization of its long-standing policy that expenses are built into the SC Sales Consultants increased commission.

### 2. Synthes' Commission Deduction Policy

Sales Consultants do not earn commissions until payment has been received and the sale is complete. Nevertheless, Synthes pays commissions in advance based on invoiced sales. Thus, even though a customer may take thirty or sixty (or more) days to pay Synthes for an invoiced product, a sales consultant receives his commission when the invoice is sent to the customer.

Synthes applies a uniform deduction policy to advanced commissions. The parties agree that Synthes' uniform deduction policy is applied in two circumstances. First, "Accounts Receivable" deductions include situations where (1) the customer claims not to have received a product that was delivered; (2) customer service receives an incorrect or invalid purchase order number; and/or (3) the customer advises Accounting that they have returned the product to the Sales Consultant but Synthes has no record of the return. Second, "Customer Service" deductions occur where an order is shipped without a purchase order number and Synthes does not receive the purchase order within 25 business days. These latter scenarios tend to happen in emergency circumstances where the typical ordering process would not be prudent.

If the uniform deduction policy applies, Synthes deducts 50% of a product's list price from the sales consultant's advanced, but unaccrued, commissions for a subsequent pay period.[7] Synthes' managerial employees testify that it is possible for a sales consultant to obtain a reversal of a deduction; however, Synthes' sales policy manual provides that *"policy dictates that extensions or reversals will not be granted."* (Doc. 116, Attach. 4, ¶ 8; Doc. 89, Attach. 2, Attach. 3) (emphasis in original). The evidence before the Court further shows that deductions are not reversed even if Synthes eventually receives payment for the sale. (Doc. 89, Attach. 5, 216:17-217:15)

---

[7] When deductions do occur, Synthes limits the total deduction to no more than $2,000 per pay period. Where a deduction exceeds $2,000 for a given pay period, the deduction is subject to payment over multiple periods. (Doc. 115, 14: 27 – 15: 3.)

Plaintiff presents two challenges to Synthes' deduction policy.  First, Plaintiff challenges the amount of deductions taken, i.e., sales consultants earn a commission equal to 2% - 12.5% of a product's list price, but Synthes takes deductions equal to 50% of a product's list price. Second, Plaintiff challenges the types of deductions taken, i.e., "Accounts receivable" and "Customer Service" deductions. Synthes argues that the amount of deductions it takes is lawful because no law proscribes the amount of deductions a company can take from "advanced," as opposed to "earned" commissions.  Moreover, Synthes argues that determining whether a sales consultant has a viable deduction claim requires individual inquiries, making this case unsuitable for class certification.

**D.      Plaintiff's Motion for Class Certification**

Based on the above-referenced legal theories, Plaintiff moves to certify two classes:

1) An "Expense Class" of all former, current, and future Sales Consultants who have been, are, or will be employed by Synthes in California from four years prior to the filing of this action (December 13, 2007) to the date of final disposition, and who are subject to the following "straight commission" compensation policies:

a) The policy that Sales Consultants from the Trauma and Spine Sales Divisions who receive "straight commission" "are not eligible for an automobile allowance or in-territory business expense reimbursement"; and

b) The policy that certain Sales Consultants from the CMF Sales Division receive "a predetermined base salary of $30,000, plus a higher level of commission with no expenses;" and

2) A "Deductions Class" of all former, current, and future Sales Consultants who have been, are, or will be employed by Synthes in California from four years prior to the filing of this action (December 13, 2007) to the date of final disposition.

### III.      DISCUSSION

**A.      Legal Standard Under Federal Rule of Civil Procedure 23**

Class certification of Plaintiff's claims is governed by Federal Rule of Civil Procedure 23. Whether or not to certify a class is within the discretion of the Court. *United Steel, Paper &*

*Forestry, Rubber, Mfg. Energy, Allied Indus. & Service Workers Int'l Union, AFL–CIO CLC v. ConocoPhillips Co.*, 593 F.3d 802, 807 (9th Cir. 2010).

A class may be certified only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a).  These requirements are "commonly referred to as the numerosity, commonality, typicality, and adequacy requirements." *Norris–Wilson v. Delta–T Group, Inc.*, 270 F.R.D. 596, 601 (S.D.Cal. 2010). Plaintiff bears the burden of establishing that all four requirements of Rule 23(a) are met. *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001).

In addition to the requirements imposed by Rule 23(a), Plaintiff bears the burden of demonstrating that the class is maintainable pursuant to Rule 23(b).  *Narouz v. Charter Commc'ns, LLC*, 591 F.3d 1261, 1266 (9th Cir. 2010).  In this case, Plaintiff seeks certification of the Class under Rule 23(b)(3). To certify a class under Rule 23(b)(3), Plaintiff must demonstrate: (1) "questions of law or fact common to the members of the class predominate over any questions affecting only individual members" ("Predominance") and (2) a class action is "superior to other available methods for the fair and efficient adjudication of the controversy" ("Superiority"). Fed. R. Civ. P. 23(b)(3).

Rule 23 is more than a pleading standard.  "A party seeking class certification must affirmatively demonstrate his compliance with the Rule – that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc."  *Wal-Mart Stores, Inc. v. Dukes*, - - U.S. - -, 131 S. Ct. 2541 at 2552 (2011) ("*Dukes*") (emphasis in original). "[A]ctual, not presumed, conformance with Rule 23(a) remains . . . indispensable." *General Telephone Co. Of Southwest v. Falcon*, 457 U.S. 147, 160 (1982). When considering a motion for class certification, the Court must conduct a "rigorous analysis" to determine "the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Dukes*, 131 S.Ct. at 2551-2; *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 980 (9th Cir. 2011).

**B.   The Expense Class**

### 1.   Rule 23(a) Requirements

#### i.   Numerosity

Rule 23(a)(1) requires the members of a proposed class to be so numerous that joinder of all of the class members would be impracticable. Fed. R. Civ. P. 23(a). "Impracticability does not mean 'impossibility,' but only the difficulty or inconvenience in joining all members of the class." *Harris v. Palm Springs Alpine Estates, Inc.,* 329 F.2d 909, 913–14 (9th Cir.1964) (quoting *Advertising Specialty Nat. Ass'n v. FTC*, 238 F.2d 108, 119 (1st Cir.1956)). Additionally, the exact size of the class need not be known so long as "general knowledge and common sense indicate that it is large." *Perez-Funez v. Dist. Dir.,* 611 F. Supp. 990, 995 (C.D. Cal. 1984).

Defendants do not dispute Plaintiffs have met the numerosity requirement, and the Court finds this requirement is met.  Based upon the evidence before the Court, there appears to be at least 120 Expense Class members.   Accordingly, the proposed Class satisfies the numerosity requirement of Rule 23(a)(1).

#### ii.   Commonality

Rule 23(a)(2) requires "questions of law or fact common to the class."  Historically, the requirements of Rule 23(a)(2) have "been construed permissively," and "[a]ll questions of fact and law need not be common to satisfy the rule."  *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1019 (9th Cir. 1998).  Indeed, "[e]ven a single [common] question" will satisfy the Rule 23(a)(2) inquiry. *Dukes,* 131 S.Ct at 2556 (internal citation omitted).

The raising of any common question, however, does not suffice. *See Ellis v. Costco,* 657 F.3d at 981*; Dukes,* 131 S.Ct. at 2551-52 ("[a]ny competently class complaint literally raises common 'questions.'") Rather, class representatives must demonstrate that common points of facts and law will drive or resolve the litigation.  *Dukes,* 131 S. Ct at 2552 ("What matters to class certification ... is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation.") (internal citations omitted). To satisfy Rule 23(a)'s commonality requirement, a class claim "must depend upon a common contention ... of such a nature that it is capable of classwide

9

resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes,* 131 S.Ct. at 2551.

Plaintiff contends Synthes has a policy which does not reimburse Expense Class members for necessary business expenses in violation of Cal. Lab.Code § 2802. Plaintiff also contends the legality of this policy can be evaluated on a class-wide basis. Synthes responds there are no common questions capable of class-wide resolution. Synthes argues the evidence demonstrates Expense Class member's necessary business expenses were indemnified through enhanced commission. Synthes further argues that these Expense Class members "knew" they would generate a higher income under the full commission model, and that regional managers orally communicate the expense allocation via enhanced commission to Expense Class.  Lastly, Synthes argues that because the California Labor Code protects only "necessary" business expenses, individual inquiries are required to determine which expenses were necessary under the circumstances.

### a.        Whether Synthes' Enhanced Commission Complies With Cal. Lab. Code § 2802 is a Common Question

Cal. Lab.Code § 2802(a) provides: "An employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties ...." The California Supreme Court has held that "an employer may satisfy its statutory business expense reimbursement obligation under section 2802 by paying employees enhanced compensation in the form of increases in base salary or commission rates." *Gattuso v. Harte–Hanks Shoppers, Inc.,* 42 Cal.4th 554, 575, 67 Cal.Rptr.3d 468, 169 P.3d 889 (2007).

Merely stating an employee's compensation is "enhanced" is insufficient.  Pursuant to *Gattuso,* "the employer must provide some method or formula to identify the amount of the combined employee compensation payment that is intended to provide expense reimbursement."[8] *Id.* at 573. Additionally, "an employer that uses salary and/or commission

---

[8] As noted in *Gattuso,* "[a]lthough section 2802 does not expressly require the employer to provide an apportionment method, it is essential that employees and officials charged with enforcing the labor laws be able to differentiate between wages and expense reimbursements. Because providing an apportionment method is a practical necessity for effective enforcement of

increases to discharge its reimbursement obligation must also communicate to its employees the method or basis for apportioning any increases in compensation between compensation for labor performed and business expense reimbursement."[9] *Id.* at 574.

As stated in *Gattuso*, when an employer claims an enhanced commission discharges its reimbursement obligations under Section 2802, the validity of a Section 2802 claim will turn on the resolution of three questions: (1) Did the employer adopt a practice or policy of reimbursing outside sales representatives for necessary business expenses by paying them higher commission rates? (2) If so, did the employer establish a method to apportion the enhanced compensation payments between compensation for labor performed and expense reimbursement? (3) If so, was the amount paid for expense reimbursement sufficient to fully reimburse the employees for the expenses they reasonably and necessarily incurred? *Id.* at 576.

Enhanced commission defenses to Section 2802 claims generally present common questions of law and fact. *See, e.g., Schulz v. QualxServ, LLC,* No. 09–cv–0017–AJB, 2012 WL 1439066, at *3 (S.D. Cal. Apr. 26, 2012) (Plaintiffs meet commonality "because they challenge uniform policies and systemic practices that apply to this class of employees." Also notable to the commonality analysis was the defendants' 'uniform defense' that they paid 'a higher salary that necessarily encompasses expenses'); *Hopkins v. Stryker Sales Corp.*, No. 5:11-CV-02786-LHK, 2012 WL 1715091, *9 (N.D. Cal. May 14, 2012) ("Whether Stryker paid a higher commission rate 'that necessarily encompasses expenses,' as Stryker argues, is 'a uniform defense' under *Gattuso*").

The Northern District of California's decision in *Stryker* confronted substantially similar claims and defenses and found commonality was met. In *Stryker,* former sales representatives brought a putative class action against Stryker Sales Corp. -- also a medical device company --

---

section 2802 's reimbursement provisions, it is implicit in the statutory scheme." *Gattuso,* 42 Cal. 4th at 572.

[9] *Gattuso* suggests this methodology should be communicated to employees in writing. *Id.* at fn. 6 ("In the future, employers that provide business expense reimbursement to employees through increases in base salary or commission rates should, in providing the documentation required by section 226, subdivision (a), separately identify the amounts that represent payment for labor performed and the amounts that represent reimbursement for business expenses.")

alleging that Stryker had a policy of not reimbursing sales representatives for their ordinary business expenses. Like here, the *Stryker* plaintiffs produced documentary evidence indicating that Stryker did not reimburse putative class members for ordinary business expenses. Also like here, the defendant in *Stryker* argued that ordinary business expenses were covered though sales commissions. *Stryker,* 2012 WL 1715091 at *2. The *Stryker* Court found commonality met, stating that "the evidence shows that the putative class members worked as Stryker sales representatives in divisions with uniform business expense reimbursement policies that, Stryker claims, reimbursed putative class members' necessary business expenses primarily through Stryker's commission-based compensation system." *Id* at 5. Accordingly, "[w]hether Stryker paid a higher commission rate 'that necessarily encompasses expenses,' as Stryker argues, is 'a uniform defense' under *Gattuso*." *Id.*

This Court finds *Stryker's* reasoning persuasive. Whether Synthes' expense reimbursement policy complies with Cal. Labor Code § 2802 and *Gattuso* presents common questions and uniform defenses that will drive the resolution of this case. At the very core of this case is the undisputed fact that Synthes does not separately reimburse the necessary business expenses of Expense Class members. On its face, this fact alone could create across-the-board liability under Section 2802. However, Synthes presents a uniform defense that applies to each and every Expense Class member: Synthes does not separately reimburse Expense Class members' business expenses because those expenses are covered through an enhanced commission permitted by *Gattuso*. Plaintiff disputes the expense policy complied with *Gattuso*. Whether Synthes paid a higher commission rate that encompasses expenses, as Synthes argues, is a uniform defense to a common contention. As in *Stryker,* whether Synthes' expense reimbursement policy for Expense Class members complies with Section 2802 and *Gattuso* are common factual contentions and entails common claims and defenses. The claims and defenses here present "the classic case for treatment as a class action: that is, the commonality linking the class members is the dispositive question in the lawsuit." *Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1030 (9th Cir. 2012).

Synthes' arguments to the contrary are not persuasive. Synthes urges the Court to find that, consistent with Section 2802 and *Gattuso,* Synthes necessarily indemnifies Expense Class

members' business expenses through an enhanced commission. This argument fails for two reasons. First, the substance of the argument calls for a merits inquiry the Court does not reach at class certification. Whether Synthes' expense policy satisfies the California Labor code and *Gattuso* and properly indemnifies Expense Class members' business expenses through an enhanced commission is one of the central merits inquiries in this case. *See, Gattuso,* 42 Cal. 4th at 576 ("was the amount paid for expense reimbursement sufficient to fully reimburse the employees for the expenses they reasonably and necessarily incurred"). In order to assess commonality, courts consider the merits "only insomuch as it must determine whether common questions exist; not to determine whether class members could actually prevail on the merits of their claims." *Ellis,* 285 F.R.D. at 506; *accord Dukes,* 131 S.Ct at 2553. Here, the Court does not need to decide whether Synthes' expense policy complies with Section 2802 to identify common questions.

On the contrary – and to the Court's second point – Synthes' raises a common defense to liability under Section 2802 that is applicable to each and every Expense Class member. Whether the enhanced commission provided to every Expense Class member covers business expenses, as Synthes adamantly argues, is a common defense applicable to the Expense Class as a whole.

Synthes also argues there are no common questions because individual inquiries are required to evaluate Expense Class claims. Synthes argues that "Section 2802 does not prescribe any one form on indemnification; what matters is that employees understand the employer's indemnification method." (Synthes' Opp., Doc. 115, 19: 2-4.) Synthes argues individual inquiries are required to determine if (1) Expense Class members knew their expenses; (2) Expense Class members knew the income generated from a straight commission structure would cover all their expenses; and (3) Synthes communicated expense allocation to Expense Class members. (Synthes' Opp., 18-21.)

Synthes' individual inquiry arguments are baseless. The language of Section 2802 and *Gattuso* does not focus on an employee's subjective knowledge of her expenses as a means of evaluating an employer's liability. Rather, *Gattuso* focuses is on the *employer's* actions. *Gattuso,* 42 Cal. 4th at 577 ("Did the employer adopt a practice or policy …?" "[D]id it [the employer] establish a method to apportion the enhanced compensation …?" "[W]as the amount

paid for expense reimbursement sufficient . . . ?") If an employer wishes to satisfy its statutory reimbursement obligation under Section 2802 by paying employees increased commission rates, the employer must take certain actions to identify the wages intended as expense reimbursement "in a way that would [not] seriously hamper or effectively preclude enforcement of the various statutory and contractual obligations." *Gattuso,* 42 Cal. 4th at 572. Regardless, Synthes raises a legal issue common to the Class. Whether an employee's understanding or subjective belief on expense reimbursement satisfies Section 2802 and *Gattuso* is a legal question that is common to the Expense Class as a whole.

Synthes' argument concerning the communication of its expense policy is also unpersuasive. Synthes argues managers orally communicate expense allocation information to sales consultants by discussing whether or not the sales consultant will generate a higher income under a straight commission compensation structure.[10]

Whether this oral communication satisfies *Gattuso* is a common question of fact. *Gattuso* 42 Cal. 4th at fn. 6 ("In the future, employers that provide business expense reimbursement to employees through increases in base salary or commission rates should, in providing the documentation required by section 226, subdivision (a), separately identify the amounts that represent payment for labor performed and the amounts that represent reimbursement for business expenses.")[11] Whether, in fact, Synthes actually communicates a formula or method to SC Sales Consultants is a common question. *Gattuso* states employers "*must* provide some method or formula to identify the amount of the combined employee compensation payment that is intended to provide expense reimbursement." *Gattuso,* 42 Cal. 4th at 573 (emphasis added).

---

[10] Notably, to the extent Synthes represents it communicates this information to *some*, but not all Expense Class members, then Synthes implicitly concedes violations of Section 2802.

[11] Section 226(a) provides: "Every employer shall, semimonthly or at the time of each payment of wages, furnish each of his or her employees, either as a detachable part of the check, draft, or voucher paying the employee's wages, or separately when wages are paid by personal check or cash, an accurate itemized statement in writing showing (1) gross wages earned, (2) total hours worked by the employee. . . (4) all deductions, provided that all deductions made on written orders of the employee may be aggregated and shown as one item, (5) net wages earned, …" Thus, *Gattuso* suggests expense allocation information should be included in the written wage statements required under Section 226.

The evidence before the Court does not suggest Synthes provides a specific method or formula to Expense Class members. The evidence offered by Synthes indicates that some Expense Class members "knew" they would obtain higher income in a straight commission position with no separate reimbursement, when compared to a partially salaried position that included separate reimbursement of expenses. *See, e.g.,* Sorensen Decl. ¶ 6 ("In the many discussions which I have had with Sales Consultants leading up to the decision to convert or not, we specifically discuss making sure that their income following the conversion will exceed their base pay plus 4% commission plus their expense allowance"); Murray Decl., ¶ 10 ("[sales consultants] want to convert because they know that they will make much more money at a 12.5% commission rate, which is well above industry norms. . . . I help the Sales Consultant calculate the differential in income between the base plus commission arrangement and the 12.5% enhanced commission rate so that he or she is certain that the amounts to be earned will more than fully cover their known business expenses as well as result in substantial additional income"); Bommarito Decl. ¶ 5 ("I personally reviewed the options and did the math . . ."); Felty Decl. ¶ 4 ("I also did my own calculations . . ."); Goeckeritz Decl. ¶ 4 ("I did the math . . .").[12]

Accordingly, whether the Synthes' "enhanced" commission, written policy and oral communication of the information discussed above satisfies Section 2802 and otherwise complies with *Gattuso* is a common question capable of generating class-wide answers.

### b. Necessary Business Expenses Present a Common Issue

Cal. Lab.Code § 2802(a) requires indemnification only for "necessary" business expenses. *See also, Gattuso,* 42 Cal. 4th at 567 (Section 2802 "requires an employer to indemnify its employees for expenses they necessarily incur in the discharge of their duties . . .) Thus, liability depends on whether "necessary" business expenses were idemnified.

---

[12] Synthes argues the progression of sales consultant compensation in Synthes' employ demonstrates expenses are built in to the SC Sales Consultants' commission. (Synthes' Opp., Doc. 117, p. 6-7.) Specifically, when employment begins, sales consultants' compensation includes salary, a lower commission rate, plus specified expenses. Once a sales consultant has met certain requirements, they are eligible to graduate to straight commission at an enhanced rate. Synthes argues this progression demonstrates that necessary business expenses are built into the enhanced commission. *Id.* Once again, whether Synthes' straight commission expense policy indemnified necessary business expenses and otherwise satisfied the requirements of the California Labor Code and *Gattuso* is a common question that will drive the litigation.

Plaintiff argues a fact-finder could look at the Expense Class members' duties and common types of expenses to determine whether a type of expense is necessary to carry out those duties. Synthes responds that determining the "necessary" business expenses is an inherently individualized question focused on the "reasonableness" of the particular expenditure when it was incurred. By way of example, Synthes argues that Expense Class members' automobile expenses vary depending on the territory they serve and the use of assistant sales consultants, who aid in day-to-day activities.   As another example, Synthes argues a sales consultant may use a single telephone line for both business and personal purposes. With respect to other expenses claimed by Plaintiff, Synthes argues some Expense Class members will have "few, if any" expenses concerning entertainment, office supply and shipping costs based on various hypothetical scenarios.  For purposes of liability, Synthes argues each of these expenses must be evaluated, at the time they were incurred, to determine if each expense was reasonable and necessary.

Whether an expense was reasonably and necessarily incurred is a "question of fact that can be ascertained by a jury." *Stryker*, 2012 WL 1715091 at * 7  (citing *Takacs v. A.G. Edwards & Sons, Inc.*, 444 F.Supp.2d 1100, 1124–25 (S.D. Cal. 2006)). When the evidence suggests there is a commonality of employment obligation and common types of expenses incurred by sales consultants, "the underlying legal issues and many of the factual determinations are common to all class members." *Dilts v. Penske Logistics, LLC* 267 F.R.D. 625, 640 (S.D. Cal. 2010) ("Given this commonality of employment obligation, an expense which is 'necessary' for a class member to do his job would also be "necessary" for any other class member"); *Stryker*, 2012 WL 1715091 at * 7  (where the putative class members had the same general duties and the evidence showed there were common types of expenses incurred by sales representatives, "a fact finder could look at the putative class members' duties and the common types of expenses and determine whether a type of expense is necessary to carry out those duties on a class-wide basis"); *Cf. Harris v. Vector Mktg. Corp.,* 753 F.Supp.2d 996, 1022 (N.D. Cal. 2010) (declining to certify class where plaintiff failed to show "common types of expenses incurred by Sales Representatives").

16

Here, it is undisputed that all of the Expense Class members had the same general duties. Moreover, the evidence before the Court demonstrates Expense Class members share common expenses. Indeed, Synthes' own documents show that some expenses incurred by Expense Class members, including communication, automobile, internet service, and home office expenses, are common across the Expense Class.[13] *See,* Synthes 2007 Policy Manuel at 471 ("All Synthes Consultants are to maintain a separate and dedicated business phone line for Synthes business . . . The expenses for the Synthes phone line, phone equipment and cell phones are the responsibility of the Consultant."); *Id.* at 449 (providing guidance for anticipated automobile expenses); *Id.* at 483 ("All Sales Consultants are required to purchase a computer based on the specification provided by Synthes. . . It is the responsibility of the Sales Consultant to obtain and maintain/service agreement for his/her PC . . . Each Sales Consultant is required to maintain the minimum configuration specified. The configuration specifies not only hardware but also operating system (i.e. Windows 98) and business software (i.e., Word, Excel, etc.) required.")

The Court is not persuaded by Synthes' argument that variances in the amount and circumstances of certain expenses require the Court to individually inquire into whether the expense was reasonable and necessary when it was incurred. Synthes mistakenly focuses on the dollar amount of expenses rather than a category of expenses. Plaintiff claims that Synthes' written policies demonstrate Synthes does not reimburse *any* expenses whatsoever. Thus, the degree or amount to which these expenses were incurred is irrelevant under Plaintiff's theory of liability. Under Plaintiff's theory that Synthes does not reimburse any expenses, liability attaches for the entire Expense Class if Plaintiff can show Expense Class members all incurred a type or category of expenses, e.g., phone, automobile or home office. Once the category of expenses is established, the degree or amount to which these expenses were incurred concern damages, not liability.

For example, Synthes argues that some Expense Class members used their Synthes telephone for both business and personal purposes. Synthes argues that this individual's phone

---

[13] The facts of this case are in contrast to *Buchanan v. Homeservices Lending LLC*, 2013 WL 1788579 (S.D. Cal. Apr. 25, 2013), relied upon by Synthes, where there was "no written policy mandating" the types of expenses that were necessary. *Id.* at *5.

expenses would need to be scrutinized to identify which aspects of the phone bill were reasonable and necessary to conducting Synthes' business. However, if Synthes does not reimburse *any* phone expenses, it is irrelevant, for liability purposes, how often that sales consultant used the phone for personal reasons.  To establish liability, all that is required is a demonstration that telephone expenses, in any amount and to any degree, are reasonable and necessary to conducting Synthes' business.  If Plaintiff prevails on his theory that Synthes does not reimburse for any expenses, liability attaches when it is demonstrated that the use of a telephone is reasonable and necessary for Synthes' business.  Once liability is established (the required use of a phone that was never reimbursed or indemnified), it does not matter if the telephone was used for Synthes' business 99% or 1% of the time.  Variances such as these concern post-liability, damage calculations which do not defeat class certification.

Whether Synthes provides any expense reimbursement or indemnification, and whether Synthes communicates this information in a manner consistent with Section 2802 and *Gattuso* are questions common to everyone in the Expense Class.  Moreover, whether a business expense is necessary per Section 2802 is a common question of fact that can be ascertained by a jury. Accordingly, the Court finds that questions of law and fact are common to the putative class.

### iii.    Typicality

Rule 23(a)(3) requires the claims or defenses of the representative parties be typical of the claims or defenses of the class.  The purpose of Rule 23(a)(3) is "to assure that the interest of the named representative aligns with the interests of the class." *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 508 (9th Cir.1992).  Claims are "typical if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Id.*  The requirement is satisfied where the named plaintiff has the same or similar injury as the unnamed class members, the action is based on conduct which is not unique to the named plaintiffs, and other class members have been injured by the same course of conduct.  *Hanon,* 976 F.2d at 508.

Plaintiff joined Synthes as a Sales Consultant in July 1999. Ex. 8, Lindell Dec. ¶3. At that time, Plaintiff's compensation structure was salary plus commission. Around November 2001, Plaintiff converted to "straight commission" compensation under which he received no separate expense reimbursement and remained on that compensation package until he left Synthes in May

2011. *Id.* ¶¶3-4. While at Synthes, Plaintiff performed the same job duties as other Expense Class members. These facts are undisputed.

The typicality requirement is met here because Plaintiff has alleged an injury identical to those of the Expense Class, stemming from uniform conduct taken against Plaintiff and the Expense Class. Plaintiff alleges that he, and the Expense Class members, were not fully reimbursed for their necessary business expenses under Cal. Lab. Code § 2802. This alleged injury, asserted in unison on behalf of the Expense Class, resulted from Synthes' expense reimbursement policy. Synthes' expense reimbursement policy is common across the three divisions and not unique to Plaintiff and his division. Therefore, Plaintiff has sufficiently established that he is typical of the proposed class.

Synthes argues Plaintiff is not a typical representative because he does not have a viable individual expense reimbursement claim. Specifically, Synthes argues the evidence shows that Plaintiff "knew his business expenses and knew that his enhanced full commission rate included indemnification for those expenses[;]" thus, Plaintiff does not have a claim under Section 2802. The evidence offered by Synthes shows Plaintiff subjectively believed, based on his independent determinations, he would generate a higher income. *See,* Lindell Dep., 108:8 - 109:4; 130: 14-20 ("Q: When you did your calculations in terms of deciding whether or not to opt to go to full commission did you also calculate based upon not only the allowance but also what your actual expenditures were to make sure that you would have all of that built in and more if you went to full commission? A: I tried. Yes.").

Discussed above, *supra,* Section III.B.1.ii.a., the relevant inquiry under Section 2802 and *Gattuso* focuses on Synthes' actions, not on Plaintiff's subjective beliefs and independent determinations. The essential issues in determining the Expense Class claims are whether Synthes provides expense reimbursement or indemnification, and whether the "enhanced" commission offered by Synthes, coupled with oral communications describing the likelihood of a higher income, complies with Section 2802 and *Gattuso*. That Plaintiff agreed to Synthes' expense reimbursement policy with the understanding he would generate higher income is inconsequential at the class certification stage. If Synthes' expense reimbursement policy is deemed to violate Section 2802, Plaintiff and Expense Class members cannot be required to

submit to an unlawful employment policy. *See,* Cal. Lab. Code § 2804 ("Any contract or agreement, express or implied, made by any employee to waive the benefits of this article or any part thereof, is null and void . . ."); *Gattuso,* 42 Cal. 4th at 561 ("section 2804, expressly prohibits waiver of the rights afforded under section 2802.") Plaintiff alleges injuries identical to those in the Expense Class, and those alleged injuries flow from an identical course of conduct; namely, Synthes' expense reimbursement policy. Accordingly, Plaintiff's claims are typical of the Expense Class.

### iv.    Adequacy of Representation

Rule 23 requires that a class be certified only if "representative parties will fairly and adequately protect the interests of the class." This factor requires that (1) the proposed representatives do not have conflicts of interest with the proposed class, and (2) that the representatives and their counsel[14] will vigorously prosecute the action on behalf of the class. *Hanlon,* 159 F.3d at 120.

Synthes argues Plaintiff is not an adequate representative because there are conflicts between former employees such as Plaintiff, and current employees who are members of the Expense Class.[15] Specifically, Synthes suggests that currently employed Expense Class members prefer straight commission to alternative compensation options, whereas individuals such as Plaintiff are only interested in money damages and have no interest in the "benefits" of the straight commission system.

There is no conflict between Plaintiff's claims and those of currently employed Expense Class members. While some Expense Class members may be satisfied with Synthes' compensation system, this lawsuit seeks to confer additional benefits on those class members. Plaintiff has not sought declaratory relief invalidating Synthes' straight commission structure.

---

[14] Synthes does not challenge the adequacy of Plaintiffs' counsel, the law firms of Lewis Feinberg Renaker & Lackson, and Lang, Richart & Patch. The Court has reviewed the declarations of Plaintiff's counsel and finds that Plaintiff is represented by qualified and competent counsel. Plaintiff's counsel has a wealth of experience in employment class actions.

[15] Synthes also argues Plaintiff is not an adequate representative for the same reasons discussed in the Court's typicality discussion.  The Court rejects those arguments for the same reasons discussed therein, and does not readdress them here.

The relief Plaintiff seeks is identical to the relief sought by both current and former Synthes employees in the Expense Class. The relief sought by Plaintiff on behalf of the Expense Class is not in conflict with, or antagonistic to, currently employed Expense Class members who are compensated by an "enhanced" commission without separate expense reimbursement. Plaintiff's interests are aligned with Expense Class member's interests in recovering for unreimbursed business expenses. Therefore, Plaintiff is an adequate representative.

### 2. Rule 23(b)(3) Analysis

Having satisfied the requirements of Rule 23(a), a plaintiff must next demonstrate that the action can be appropriately certified under Rule 23(b)(1), (b)(1) or (b)(3). Plaintiff seeks to certify the class under Rule 23(b)(3). To do so, Plaintiff must establish that (1) "questions of law or fact common to the members of the class predominate over any questions affecting only individual members" ("Predominance") and (2) a class action is "superior to other available methods for the fair and efficient adjudication of the controversy." ("Superiority"); Fed. R. Civ. P. 23(b)(3).

### i. Predominance

Mere commonality pursuant to Rule 23(a)(2) is insufficient to meet Rule 23(b)(3)'s predominance requirement. *See Hanlon*, 150 F.3d at 1022. Rule 23(b)(3) instead concerns "the relationship between the common and individual issues." 'When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than an individual basis.' " *Hanlon*, 150 F.3d at 1022 (citing Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 1778 (2d ed.1986)). "Because no precise test can determine whether common issues predominate, the Court must pragmatically assess the entire action and the issues involved." *Romero v. Producers Dairy Foods, Inc*., 235 F.R.D. 474, 489 (E.D. Cal. 2006). The Rule 23(b)(3) predominance analysis "focuses on 'the relationship between the common and individual issues' in the case and 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Wang v. Chinese Daily News*, 737 F.3d 538, 545 (9th Cir. 2013) (quoting *Hanlon*, 150 F.3d at 1022). As the Supreme Court recently emphasized, "Rule 23(b)(3) requires a showing that *questions* common to the class

predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen Inc. v. Conn. Retirement Plans & Trust Funds*, 133 S. Ct. 1184, 1191 (2013) (emphasis in original).

Synthes argues common issues do not predominate because the Court would need to make the following individual inquiries: (1) whether the Expense Class members knew his necessary expenses; (2) whether the Expense Class member understood his enhanced commission rate included specific allocation for those expenses; (3) whether a business expense was "necessary;" and (4) individual damage calculations will overwhelm common issues, citing *Comcast Corp. v. Behrend,* 133 S. Ct. 1426, 185 L. Ed. 2d 515 (2013). The Court has rejected the first two arguments as a misstatement of the law, while the third argument does not entail individualized inquiries.  The Court now addresses Synthes' argument that individual damage calculations will overwhelm common issues pursuant to *Comcast.*

In *Comcast,* the Supreme Court reversed an order granting class certification because the plaintiffs relied on a damage regression model that "did not isolate damages resulting from any one theory of antitrust impact." *Id.* at 1431. Specifically, the measure of damages flowed from four different antitrust theories; however, only one of those theories was viable at trial. Thus, the *Comcast* plaintiffs failed to link the asserted damages to the relevant theory of liability. *Comcast* concluded that "a model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory." *Id.* at 1433.

Based on the Supreme Court's decision in *Comcast,* Synthes argues that individual expense calculations will overwhelm any common issues.  For example, at oral argument, Synthes argued that a sales consultant may have a business phone expense, but nonetheless, uses that phone for personal reasons 25% of the time.  Other examples offered by Synthes include variations in automobile, entertainment and home office expenses.

The Court disagrees with Synthes' interpretation of *Comcast*. The *Comcast* ruling reiterated a fundamental focus of the Rule 23 analysis: The damages must be capable of determination by tracing the damages to the plaintiff's theory of liability. However, so long as the damages can be determined and attributed to a plaintiff's theory of liability, damage calculations for individual class members do not defeat certification.  *Blackie v. Barrack,* 524

F.2d 891, 905 (9th Cir.1975) ("[t]he amount of damages is invariably an individual question and does not defeat class action treatment"); *Yokoyama v. Midland Nat'l Life Ins. Co*., 594 F.3d 1087, 1094 (9th Cir. 2010) ("The potential existence of individualized damage assessments ... does not detract from the action's suitability for class certification."). Post *Comcast,* the Ninth Circuit has reiterated this black letter rule. *Leyva v. Medline Indus., Inc.,* 716 F.3d 510, 514 (9th Cir. 2013) ("plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability").[16]   Thus, on individual damage calculations, the *Comcast* ruling breaks no new grounds, nor does it alter the existing class certification construct.

The damages relevant to the Expense Class claims concern necessary business expenses that, according to Plaintiff, were never reimbursed. If Expense Class members prove Synthes' liability, all the damages will flow from Plaintiff's theory of liability: Synthes' unlawful expense reimbursement policy.   Unlike the plaintiffs in *Comcast,* Plaintiff's theory of liability here directly correlates with Plaintiff's claim for damages.   As discussed above, the degree to which these expenses were incurred – for example, a sales consultant using his Synthes phone for personal reasons 25% or 75% of the time – concerns the amount of damages and does not affect liability determinations. These individual damages calculations, under *Comcast* as interpreted by the Ninth Circuit, do not predominate. *Leyva* 716 F.3d at 514; *see also, Schulz,* 2012 WL 1439066, *6 (holding that such issues as "the distance driven between service calls and the particular plan selected for internet and cell phone services" relate to damages); *Balasanyan,* 2013 WL 4517821, *7 ("Minor variations on a theme, such as the precise activities that salespeople were engaging in . . . , should not contain the seeds of destruction for a putative class.").

The following questions predominate and will drive the resolution of Plaintiff's claims: (1) Did Synthes adopt a practice or policy of reimbursing Expense Class members for necessary business expenses by paying them higher commission rates? (2) If so, did Synthes establish a method to apportion the enhanced commission payments between compensation for labor performed and expense reimbursement? (3) What are the "necessary" expenses reasonably

---

[16] Indeed, the Supreme Court even clarified in *Dukes* that "individualized monetary claims belong in Rule 23(b)(3)." *Dukes,* 131 S.Ct. at 2558

incurred; and (4) Was the amount paid for expense reimbursement sufficient to fully reimburse the employees for the expenses they reasonably and necessarily incurred?[17]   The Court has determined these issues entail common claims and defenses that can be adjudicated in one stroke.  Therefore, the Court finds that common issues predominate.

### ii.  Superiority

The superiority requirement tests whether "class litigation of common issues will reduce litigation costs and promote greater efficiency."  *Valentino v. Carter-Wallace, Inc.,* 97 F.3d 1227, 1234 (9th Cir. 1996).  "If each class member has to litigate numerous and substantial separate issues to establish his or her right to recover individually a class action is not superior." *Zinser,* 253 F.3d at 1192.  Rule 23(b)(3) specifies four nonexclusive factors that are "pertinent" to a determination of whether class certification is the superior method: (1) the class members' interests in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already begun by or against class members; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the likely difficulties in managing a class action.  Fed. R. Civ. P. 23(b)(3)(A)-(D).

Class adjudication is the superior method for resolving the claims at issue here.  No class member would be required to individually establish her right to recover because all the merits determinations can be made on a class-wide basis. There is no evidence that Expense Class members have any interest in controlling prosecution of their claims separately. The Court is not aware of any other litigation raising the claims at issue here which have been commenced elsewhere on behalf of Expense Class Members. Concentrating this litigation in California is efficient because the entire Class is composed of California residents. Lastly, there will not be any undue difficulty in managing this litigation as a class action. Because Expense Class members can be identified from Synthes' records, individual notice can be readily accomplished. Moreover, while individual damage calculations are likely -- assuming liability is established --

---

[17] Notably, because Synthes argues its enhanced compensation "necessarily" reimburses all Expense Class members business expenses, this uniform defense makes this final question particularly suitable for class-wide resolution.

the class size is sufficiently small such that individual damage calculations will not create any manageability problems.   This employment action is well suited for class treatment, and litigation on a class basis is a superior method for adjudicating Plaintiffs' claims.

**C.      The Deductions Class**

**1.      Legal Standard For Commission Deduction Claims**

Plaintiff's Deduction Class claims primarily fall under Section 221 of the California Labor Code. Labor Code section 221 states that "[i]t shall be unlawful for any employer to collect or receive from an employee any part of wages theretofore paid by said employer to said employee." Wages are defined to include "all amounts for labor performed by employees ... whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis, or other method of calculation." Cal. Lab. Code, § 200. Under this definition, sales commissions are considered "wages." *Reid v. Overland Machined Products* 55 Cal.2d 203, 207–208, 10 Cal.Rptr. 819, 359 P.2d 251 (1961); *Koehl v. Verio, Inc.* 142 Cal.App.4th 1313, 1329, 48 Cal.Rptr.3d 749 (2006).

Labor Code Section 221 prohibits an employer from deducting amounts from an employee's wages, even as a set-off for amounts clearly owed by the employee. *See Barnhill v. Robert Saunders & Co*. 125 Cal.App.3d 1, 6, 177 Cal.Rptr. 803 (1981).  This prohibition reflects "California's strong public policy favoring the protection of employees' wages," including amounts earned through commissions on sales. *Harris v. Investor's Business Daily, Inc*. 138 Cal.App.4th 28, 40–41, 41 Cal.Rptr.3d 108 (2006). Labor Code section 221's rights are nonnegotiable and cannot be waived by the parties. Cal. Lab.Code, § 219. "By enacting [Labor Code] section 221 ... the Legislature has prohibited employers from using self-help to take back any part of 'wages theretofore paid' to the employee, except in very narrowly defined circumstances provided by statute." *Hudgins v. Neiman Marcus Group,* 34 Cal.App.4th 1109, 1121 (1995)

One circumstance in which a wage deduction is permitted allows an employer to recover a commission that was "advanced" but not yet "earned." *Steinhebel v. Los Angeles Times Communications, LLC* 126 Cal.App.4th 696, 705 (2005). Generally, "[t]he essence of an advance is that at the time of payment the employer cannot determine whether the commission will

eventually be earned because a condition to the employee's right to the commission has yet to occur or its occurrence as yet is otherwise unascertainable." *Id.* at 705. This principle is also embodied in Labor Code section 224, which provides in pertinent part that "[t]he provisions of Sections 221, 222 and 223 shall in no way make it unlawful for an employer to withhold or divert any portion of an employee's wages ... when a deduction is expressly authorized in writing by the employee to cover ... deductions not amounting to a rebate or deduction from the standard wage arrived at ... pursuant to wage agreement or statute...."; *see also, Adams v. Pacific Bell Directory,* 216 F.3d 1082 (9th Cir. 2000) ("For claims arising under § 221, the employees' commissions are treated by § 224 of the California Labor Code as "unearned" until [the employer] receives payment for the goods sold by the employee.")

Generally, the right to a commission depends on the terms of the parties' contract. "A commission is 'earned' when the employee has perfected the right to payment; that is, when all of the legal conditions precedent have been met. Such conditions precedent are a matter of contract between the employer and employee, subject to various limitations imposed by common law or statute." *Koehl,* 142 Cal.App.4th at 1335. Once the express contractual conditions are satisfied, the commission is considered a wage and an employer cannot recoup the commission once it has been paid to the employee. *Sciborski v. Pacific Bell Directory,* 205 Cal. App. 4th 1152, 1167 (2012).

An employer's right to define an "earned" commission in the employment contract is not unlimited. For example, an employer may expressly condition an earned sales commission on the sale becoming final (e.g., no returns within a specified time or final payment received) or on the employee completing work in providing follow-up services to the customer. *See Sciborski,* 205 Cal. App. 4th at 1168 (listing cases and identifying circumstances where conditions to earning a commission were permitted). But an employer is not entitled to "require[ ] its employees to consent to unlawful deductions from their wages." *Hudgins,* 34 Cal. App. 4th at 1111-1112. For example, "an employer may not require an employee to agree to a wage deduction in the guise of recouping an advance based on conditions that are unrelated to the sale and/or that merely reflect the employer's attempt to shift the cost of doing business to an employee." *Sciborski,* 205 Cal. App. 4th at 1168; *see also, Hudgins,* 34 Cal. App. 4th at 1111-1112 ("retailer commission policy

unlawful because it deducted wages for "unidentified returns," which potentially penalized an employee for the misconduct of other employees or customers"). Where a deduction is "unpredictable, and is taken without regard to whether the losses were due to factors beyond the employee's control," an employer "cannot avoid a finding that its [sales commission policy] is unlawful simply by asserting that the deduction is just a step in its calculation of commission income." *Hudgins*, 34 Cal. App. 4th at 1123–1124.

Synthes uniformly applies the following deduction policy to Deduction Class members:

**COMMISSION DEDUCTIONS**

A.    **Deductions from Unaccrued Commissions**

> If Synthes does not receive payment of an ordered item for any of the reasons specific in this section, 50% of the list price of the order will be deducted from the Sales Consultant's unaccrued commissions.  The term "unaccrued commissions" includes both past and future advances.

(Synthes' 2007 Sales Policy Manual, Doc. 89, Attach. 2 at 440-443.)  Synthes' policy manuals explain in further detail the circumstances in which Synthes will take a deduction. S*ee, Id.; See also,* Doc. 89, Attach. 3 at 496-497).

Plaintiff's claims on behalf of the Deductions Class are twofold.   First, Plaintiff challenges the amount of deduction taken (50% of a product's list price).  Plaintiff argues this policy is unlawful because sales consultants receive a commission of only 2% - 12.5% of the product's list price.  Plaintiffs argues the amount of Synthes' deductions reflect an attempt to shift the cost of doing business to the sales consultant in violation of California law.  Second, Plaintiff challenges the instances in which deductions are taken, e.g., the "accounts receivable," "customer service" and non-payment deductions. Plaintiff argues the instances in which Synthes takes deductions are beyond the Deduction Class' members control and unlawful under California law.

2.    **Rule 23(a) Requirements**

i.    **Numerosity**

Synthes does not dispute the Deduction Class is sufficiently numerous such that joinder of all class members is impracticable. Plaintiff's evidence shows that the proposed Deductions

1    Class numbers at least 180 people.[18]  *See* Ex. 1 at 3584-88.  This Court concludes numerosity is

2    met.

3              ii.    **Commonality**

4              Plaintiff argues commonality is met because Synthes' deductions policy uniformly

5    applies to all Deduction Class members. Plaintiff argues the Court will not need to review each

6    deduction or otherwise conduct an "as-applied" analysis to determine liability because the

7    legality of the deduction policy can be evaluated on the face of the written policy itself.  Synthes

8    does not dispute that its deduction policy is applied uniformly to all sales consultants. Synthes

9    also does not suggest that an evaluation of the types of deductions taken, e.g., accounting,

10   customer service and non-payment, requires individualized inquiries.

11             Instead, Synthes argues that a comparison of the deduction percentage and the

12   commission percentage is an improper way to evaluate the legitimacy of Synthes' deduction

13   policy, and that a proper inquiry into the merits of Synthes' deduction policy entails individual

14   inquiries.  Synthes argues Plaintiff's "simplistic argument that Synthes' deduction rate (50%)

15   exceeds [the sales consultant's] commission rates (up to 12.5%), *see* Pl.'s Mem. At 14, ignores

16   entirely that Synthes advances commissions and, by policy, takes deductions only from those

17   advanced payments."  Synthes' Opp., 27-28, Doc. 115.  Synthes argues, a claim that deductions

18   reduced "accrued" commissions could only be shown in the following situations: (1) the sales

19   consultant "will need to show that his deductions exceeded his advances in a specific pay

20   period;" and (2) the sales consultant will "need to show that, upon termination, his combined

21   deductions exceeded his combined advances (and each [sales consultant] will not even have a

22   ripe claim until he terminates employment)."  According to Synthes, these inquiries require

23   individualized merits determinations.

24             The Court disagrees with Synthes' approach to Deduction Class liability. At the core of

25   Synthes' position are two premature, unsupported merits conclusions.  First, Synthes takes the

26   position that because commissions are not yet earned, Synthes may take any amount of

27   _____

     [18] Synthes submitted evidence indicating that thirty-eight of these class members have never been

28   assessed a deduction.  Explained in greater detail below, the Court amends the Deduction Class
     definition to require the putative class member incur a deduction at some point during the
     relevant class period.

                                                    28

deductions from advanced commissions.[19] Second, Synthes concludes that a deduction claim exists only when a sales consultant realizes a net loss of income at some point during Synthes' employ.  Both of these arguments present merits inquiries common to all Deduction Class members.  Can Synthes take any deduction amount it pleases from advanced commissions?  Do Deduction Class members need to show they incurred a net loss in Synthes' employ? These are common questions, capable of generating common answers that will resolve the deduction claims in one stroke.

Synthes maintains an express, written deduction policy that applies uniformly to all Deduction Class members. The relevant merits inquiries can all be resolved on a class-wide basis.  Whether Synthes and Deduction Class members have an established agreement proscribing the conditions necessary to earn a commission is a question common to all Class members. *Koehl,* 142 Cal. App. at 1330 ("it is clearly the law in California that a sales[person] is required to repay the excess of advances made over commissions earned when there is an express agreement on the part of the sales[person] to repay such excess.") Whether these uniform conditions are based on Deduction Class member's sales can be answered on a class-wide basis. *Sciborski,* 205 Cal. App. 4th at 1168 ("an employer may not require an employee to agree to a wage deduction in the guise of recouping an advance based on conditions that are unrelated to the sale . . .") Whether the types of deductions taken by Synthes, e.g., Accounts Receivable and Customer Service deductions, are permissible is a common question capable of generating common answers. Finally, whether the amount of deduction (50% of the product's list price) compared with the commission advanced (2% - 12.5% of the product's list price) represents an attempt by Synthes to "shift the cost of doing business" to Deduction Class members is a common legal question that can be answered for the Class as a whole. Accordingly, whether Synthes' uniform deduction policy violates the California Labor Code and related statutes and case authority presents common questions, capable of generating common answers apt to drive the resolution of this litigation.

---

[19] While not explicitly stated in Synthes' opposition, Synthes confirmed this was its position at oral argument.

### iii.    Typicality

Plaintiff's claims are typical of the Deduction Class.  Plaintiff alleges he and putative class members suffered similar injuries (decreased commission as a result of unlawful deductions) based on Synthes' identical course of conduct (a uniform and allegedly unlawful deduction policy).  Because Plaintiff has suffered an injury similar to members of the proposed classes, this action is based on Synthes' common policies and practices with respect to all class members, and other class members have been injured by the same course of conduct, Plaintiff is typical of the proposed classes. *See Costco*, 657 F.3d at 984.

Synthes argues that typicality is not met because "at least ***thirty-eight*** putative class members had no deductions over the class period."[20]  Doc. 115, 28: 24-24. (Emphasis in original.)  At oral argument, the Court expressed concerns about including individuals in the Deduction Class who never had a deduction taken against them.  In response to questioning from the Court, Plaintiff agreed that the Deduction Class definition should be modified to include only members of the Class who incurred a deduction at some time during the relevant class period. Accordingly, the Court will modify the Deduction Class definition.

### iv.    Adequacy

Synthes does not offer any argument concerning the adequacy of Plaintiff or Plaintiff's counsel to represent the proposed Deduction Class.[21]  The relief sought by Plaintiff on behalf of the Deduction Class is not in conflict with, or antagonistic to, any other Deduction Class members. Plaintiff's interests are aligned with Deduction Class member's interests in recovering excessive or unwarranted commission deductions. Plaintiff is an adequate representative.[22]

---

[20] Synthes offers additional typicality arguments relying on the same erroneous assumptions the Court rejected in the commonality discussion. For the same reasons discussed therein, the Court finds these arguments irrelevant to the typicality analysis, and does not address them any further.

[21] Synthes opposition contains a heading that states "Lindell is not a typical or adequate class representative."  However, the arguments contained within only address whether Plaintiff is a "typical" representative.  Synthes does not provide any reason that Plaintiff or Plaintiff's counsel would not adequately represent the Deduction Class.

[22] For the same reasons provided in the Court's Expense Class analysis, the Court finds Plaintiff's counsel will adequately represent the Deduction Class.

3.      **Rule 23(b) Requirements**

i.      **Predominance**

Determining whether Synthes' deduction policy violates California law implicates common factual inquiries and common legal questions that apply identically to each class member and predominates over any individual questions. It is undisputed Synthes maintains a uniform deduction policy applicable to all Deduction Class members – both in terms of the amount of deduction taken and the circumstances in which a deduction is taken.  The Court can evaluate the legality of the deduction policy based on Synthes' written policy and is thus subject to common proof. *See, In re Taco Bell Wage & Hour Actions*, 2012 WL 5932833, at *7 (E.D. Cal. Nov. 27, 2012) ("individual inquiries are unnecessary where, as here, the claim is based on an invalid policy"). The common factual and legal issues discussed in the Court's commonality analysis, *supra,* Section III.C.2.ii., are *the* predominant questions that will generate common answers necessary to resolve the Deduction Class's claims.

Synthes argues its policy, as applied, is legal.[23]  Synthes additionally argues that common issues do not predominate because the Court will have to determine if each deduction was taken from a class member's accrued commissions. Thus, the Court will have to assess the following individual inquiries: "(1) the amount of the deduction, (2) the size of the [sales consultant's] bank of unaccrued commissions (which itself requires the Court to determine when Synthes obtained payment for each invoiced sale by the [sales consultant] and each advance was earned), (3) whether the actual deduction exceeded the value of the commissions advanced to the [sales consultant];" and (4) "[i]f the deduction was taken from accrued commissions, the Court will also need to determine whether the deduction was reversed." (Synthes' Opp., Doc. 115, 29-30.) The Court has already rejected Synthes' first three arguments and addresses them no further. *See, supra,* Section III.C.2.ii. As for Synthes' final argument, the Court is not persuaded.

Synthes' 2007 and 2010 Sales Policy Manuals explicitly state that "policy dictates that extensions or reversals will not be granted." Doc. 89, Attach. 2 at 440; Attach. 3 at 495. While Synthes has submitted declarations stating that managers do in fact have the discretion to reverse

---

[23] Of course, at the class certification stage, the legality of Synthes' deduction policy is not at issue.

a deduction, Synthes' Opp., Doc. 115 at 14, Synthes' own 30(b)(6) witness states that "it usually is pretty difficult to get that done, [i.e., reverse a deduction]." Thus, it appears to the Court that the occasional reversal of a deduction is rare and at most a minor divergence from Synthes' overarching policy.   Ultimately, an inquiry into the few instances where a deduction was reversed is a damages issue and does not predominate over common issues.

### ii.   Superiority

Class adjudication is the superior method for resolving Deduction Class's claims.   No class member would be required to individually establish her right to recover because all the merits determinations can be made on a class-wide basis. There is no evidence that Deduction Class members have any interest in controlling prosecution of their claims separately. The Court is not aware of any other litigation raising the claims at issue here which have been commenced elsewhere on behalf of Deduction Class Members. Concentrating this litigation in California is efficient because the entire Class is composed of California residents. There will not be any undue difficulty in managing this litigation as a class action and because Deduction Class members can be identified from Synthes' records, individual notice can be readily accomplished. Moreover, while individual damage calculations are likely -- assuming liability is established -- the class size is sufficiently small such that individual damage calculations will not create any manageability problems.   This employment action is well suited for class treatment, and litigation on a class basis is a superior method for adjudicating Plaintiffs' claims.

### CONCLUSION AND RECOMMENDATIONS

Having carefully considered the parties' submissions and the entire record in this case, the Court RECOMMENDS Plaintiff's Motion for Class Certification be GRANTED.   The Court RECOMMENDS the following classes be certified:

1) An "Expense Class" of all former, current, and future sales consultants who have been, are, or will be employed by Synthes in California from four years prior to the filing of this action (December 13, 2007) to the date of final disposition, and who are subject to the following "straight commission" compensation policies:

a) The policy that sales consultants from the Trauma and Spine Sales Divisions who receive "straight commission" "are not eligible for an automobile allowance or in-territory business expense reimbursement"; and

b) The policy that sales consultants from the CMF Sales Division receive "a predetermined base salary of $30,000, plus a higher level of commission with no expenses;" and

2) A "Deductions Class" of all former, current, and future Sales Consultants who have been, are, or will be employed by Synthes in California from four years prior to the filing of this action (December 13, 2007) to the date of final disposition, who at some time during Synthes' employ had a deduction assessed against them.

The Court FURTHER RECOMMENDS that Troy M. Lindell be appointed as Class representative.

The Court FURTHER RECOMMENDS the law firm of Lewis Feinberg Renaker & Jackson be appointed as Lead Class Counsel, and the law firm of Lang, Richert & Patch be appointed as Class Counsel.

The Court will set a scheduling conference upon the conclusion of this motion.

These findings and recommendations are submitted to the district judge assigned to this action, pursuant to Title 28 of the United States Code section 636(b)(1)(B) and this Court's Local Rule 304. Within fifteen (15) days of service of this recommendation, any party may file written objections to these findings and recommendations with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The district judge will review the magistrate judge's findings and recommendations pursuant to Title 28 of the United States Code section 636(b)(1)(C).

The parties are advised that failure to file objections within the specified time may waive the right to appeal the district judge's order. *Martinez v. Ylst,* 951 F.2d 1153 (9th Cir.1991).

IT IS SO ORDERED.

Dated:   **March 4, 2014**                    /s/ *Barbara A. McAuliffe*

UNITED STATES MAGISTRATE JUDGE

33